## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Crim. No. 19-658 (KM) |
| **v.** | |
| **DARRYL DANCY** | **OPINION and ORDER** |

The defendant, Darryl Dancy, has filed a motion (DE 23) to suppress evidence or for a *Franks* hearing. The motion is directed primarily at evidence seized as a result of searches of (a) Dancy's residence in Irvington, and (b) Dancy's automobile, and it more indirectly addresses a search of (c) a second residence in Rahway. The motion primarily challenges the adequacy of the probable-cause showing in support of search warrants issued by the New Jersey Superior Court, Essex County. Under the deferential standards of *Illinois v. Gates* and *Franks v. Delaware,* the motion must be denied.

## I.    Introduction

On September 17, 2019, Mr. Dancy was charged in a one-count Indictment with possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (DE 19) On November 28, 2019, he filed the motion to suppress (DE 23) that is the subject of this Opinion, and on December 13, 2019, the government filed a response. (DE 24) On January 3, 2020, the grand jury returned a Superseding Indictment (DE 25) containing the following charges:

Count 1     Possession with intent to distribute 100 grams or more of heroin (21 U.S.C. § 841(a)(1) & (b)(1)(B))

Count 2     Possession of short-barreled shotgun in furtherance of drug trafficking crime (18 U.S.C. § 924(c)(1)(B)(i))

Count 3       Possession of short-barreled rifles in furtherance of drug trafficking crime (18 U.S.C. § 924(c)(1)(B)(i))

Count 4       Possession of firearms without serial numbers (26 U.S.C. §§ 5861(i) & 5871)

Count 5       Possession of firearms by a convicted felon (18 U.S.C. § 922(g)(1))

On February 4, 2020, Mr. Dancy was arraigned on the Superseding Indictment. Because the motion to suppress had been filed before the return of the Superseding Indictment, I instructed defense counsel to inform the Court whether any supplementation of the motion to suppress would be required. (DE 26) The COVID-19 crisis intervened. On June 11, 2020, in response to an inquiry from chambers, counsel stated that Defendant would stand on the motion as-is.

## II.   The Searches

### A. Search Warrant and Search of Dancy Residence in Irvington

On June 18, 2018, the Essex County Prosecutor's Office ("ECPO") obtained a search warrant (the "Dancy Residence Warrant") for Mr. Dancy's residence in Irvington, New Jersey (the "Dancy Residence"). That warrant was issued by the Honorable Mark Ali, J.S.C., of the Superior Court of New Jersey, Essex County. The Affidavit in support of the application for the Dancy Residence Warrant was signed by Detective John J. DeGroot of the Essex County Prosecutor's Office. ("Affidavit #1")[1]

Affidavit #1 related that DEA Special Agent Eric Tyler had reported to DeGroot that he had been working with a confidential source ("CS")[2] for some seven months. The information furnished by the CS had proven reliable in the past; it had led to seizures of large quantities of heroin, money, and a firearm.

---

[1]      The Dancy Residence Warrant and the supporting Affidavit #1 were furnished to chambers by the defendant as Exhibit B to the motion. The exhibits were not attached to the filed version of the motion, but are now filed as DE 31.

[2]      In this Opinion, I will arbitrarily use the male pronoun to refer to CS. I possess no information about this person beyond what appears in the search warrant applications.

Affidavit #1 described a meeting between CS and Dancy on May 20, 2018, at the Dancy Residence:

> While at the location [*i.e.*, the Dancy Residence], the CS was conversing with a black male known to the CS as "Darryl." Darryl is known to live at the location and operates a black Chevrolet Silverado bearing New Jersey Registration H45JVS. Darryl is known to distribute large quantities of CDS-Heroin to various individuals (midlevel narcotic distributors) from out of the State of New Jersey. While inside the location the CS observed a kilogram of suspected CDS-Heroin, to which both parties were discussing various ways to "cut" the CDS-Heroin. (Cut-common street terminology for diluting the product to double the amount of the product for sale). Also while inside the apartment on or about September 17, the CS observed two (2) AR-15 style assault rifle[s] which Darryl related to the CS was made for him by a friend. Darryl further stated that he had another similar rifle and that he could get one for the CS to purchase, which would cost approximately $2,000. Both of these weapons Darryl stated were ghost guns. (Ghost gun – a firearm which was manufactured without a serial number is and difficult to trace the weapon's origins.) which he obtained from a friend in South Jersey.

A search of New Jersey motor vehicle records revealed that the 2015 Silverado was registered to Darryl Dancy. A check of PSEG utility records showed that Darryl Dancy was the subscriber for the Dancy Residence address. The CS identified a photo of Dancy as the person he knew as "Darryl."

Affidavit #1 relates that four days later, on May 24, 2018, CS met with Darryl (*i.e.*, Dancy) in Dancy's store, which is located in the back of the Dancy Residence. CS asked about the "previously observed narcotics and weapons," and Dancy replied that he would show them to CS again the next time the CS was in Dancy's residence.[3]

Affidavit #1 states that on June 15, 2018, CS again met with Dancy at the Dancy Residence. There, CS "observed a two-toned gray and black backpack on the kitchen table. The backpack contained one kilogram of

---

[3]    Affidavit #1 relates that at on June 4, 2018, DeGroot applied for and obtained a search warrant for the Dancy Residence. This warrant was apparently never executed.

suspected CDS-Heroin which was tan in color and inside of a clear zip lock style bag."

A criminal record check of Dancy showed that he had six prior arrests, ultimately yielding seven felony convictions. The arrests included narcotics-related offenses, terroristic threats, robbery, unlawful possession of weapons, unlawful possession of a weapon for an unlawful purpose, theft, burglary tools, aggravated assault on law enforcement, multiple receiving stolen property offenses, resisting arrest, eluding, and threatening to kill/harm a police animal. The felony convictions were for conspiracy to commit theft, aggravated assault on law enforcement, receiving stolen property (2), resisting arrest, eluding, and theft.

Based on that information, on June 18, 2018, Judge Ali issued a search warrant for the Dancy Residence in Irvington. The officers began to execute the warrant at 5:55 a.m. the following morning. Dancy was not then at home.[4]

Items seized at the Dancy Residence included the following:

(a) a 12-gauge Mossberg Maverick Model 88 pump-action shotgun, bearing serial number MV69340K, with a barrel length of less than 18 inches;

(b) two .223 caliber semiautomatic rifles with unknown manufacturer, both bearing no serial number;

(c) a .223 caliber Kel-Tec Model PLR16 semiautomatic pistol, bearing serial number POC58;

(d) a .45 caliber Smith & Wesson Model SW1911PD semiautomatic handgun, bearing serial number JRJ2091, which was loaded with eight rounds of .45 caliber ammunition;

(e) a .40 caliber Smith & Wesson Model SW40VE semiautomatic handgun, bearing a defaced serial number, which was loaded with thirteen rounds of .40 caliber ammunition;

---

[4] Exhibit C to the motion includes a report, dated June 19, 2018 (the "6/19 Report"), describing *inter alia* this search and the items seized. *See also* Motion Ex. E (inventory of items seized). (Exhibits are filed separately at DE 31.)

(f) a .38 caliber Smith & Wesson Model 638-3 revolver, bearing serial number CMY7698;

(g) a .22 caliber Iver Johnson Model Supershot Sealed Eight revolver, bearing serial number L35080, which was loaded with eight rounds of .22 caliber ammunition;

(h) a 9-millimeter Pietro Beretta Model 92FS semiautomatic handgun, bearing serial number J25615Z, which was loaded with fifteen rounds of 9-millimeter ammunition;

(i) a .40 caliber Kel-Tec Model SUB-2000 semiautomatic rifle, bearing serial number E2156, which was loaded with fifteen rounds of .40 caliber ammunition.

(j) two firearms silencers;

(k) hundreds of rounds of ammunition in various calibers;

(l) raw heroin in both distribution and individual dosage quantities;

(m) drug packaging paraphernalia (including stamps, thousands of glassine envelopes, a money counting machine, digital scales)

(n) $22,370 in cash;

(o) a bulletproof vest.

The firearms listed as items (a), (c), (d), and (i) were determined to be stolen.

### B. Search Warrant for the Silverado and Rahway Residence

After the search of Dancy's residence in Irvington, officers went to look for him at the residence of his girlfriend[5] in Rahway (the "Rahway Residence"), and eventually found him driving his 2015 Silverado (the "Silverado"). The officers then went to Judge Ali and obtained a search warrant for the Silverado and the Rahway Residence. The supporting affidavit, Affidavit #2,[6] repeated the facts contained in the original application for the Dancy Residence warrant. It added the following facts:

---

[5]    In identifying this person as Dancy's "girlfriend," I intend no disrespect. The name of the person is withheld to preserve her anonymity, and the affidavit and police reports refer to her in this manner.

[6]    Affidavit #2 is contained in Ex. D to the motion.

The Dancy Residence Warrant had resulted in the seizure of four assault rifles, five handguns, one sawed off shotgun, silencers, large capacity magazines, rounds of ammunition, approximately $22,000 in cash, CDS packing materials, 200 glassine envelopes containing heroin, and 210 grams of raw heroin.

On June 19, 2018, at approximately 10 a.m., three officers went to the residence of Dancy's girlfriend in Rahway, New Jersey (the "Rahway Residence"). The girlfriend told the officers that Dancy had left earlier, she and permitted the officers to walk through the residence to confirm that Dancy was not there. The officers observed a rifle and shotgun in a closet, as well as a .45 caliber handgun under a bed. On a coffee table were tan rubber bands commonly used in packaging heroin. On the kitchen table was a cardboard box containing glassine envelopes, commonly used to package heroin for distribution, as well as similar, empty cardboard boxes.

Shortly thereafter, at 11:20 a.m., two other officers observed Dancy driving his Silverado on Chancellor Avenue in Irvington. Based on the results of the earlier search warrant at the Dancy Residence, the officers pulled over the Silverado. (Motion Ex. C, 6/19 Report). Dancy stated "I got nothing left just two (2) bricks. You already hit my house." (The affidavit relates that a "brick" is a term for 50 glassine envelopes of heroin.) The officers arrested Dancy and impounded the Silverado.

Based on all of those facts, Judge Ali issued a search warrant for the Silverado and the Rahway Residence. (Motion, Ex. D)

The search of the Silverado on June 20, 2018, yielded the following:

(a) black and gray backpack;

(b) an Apple iPhone;

(c) an Apple iPad;

(d) a laptop and charging devices;

(e) various pieces of mail belonging to Dancy;

(f) $168 in U.S. currency.

The search of the Rahway Residence, also on June 20, 2018, yielded the following:

(a) a 12 gauge Kel Tec Shotgun, bearing serial number X0P11;

(b) a .223 caliber Anderson Manufacturing Model AM-15 semiautomatic rifle, bearing serial number 16052747 (with a 30- round magazine);

(c) .45 caliber Glock semiautomatic handgun, bearing serial number BEVE672;

(d) raw heroin in both distribution and individual dosage quantities;

(e) drug packaging paraphernalia (including stamps, glassine envelopes, a money counting machine, digital scales)

(f) $1,220 in cash.

Later investigation revealed that item (c), the .45 Glock semiautomatic, was legally owned by Dancy's girlfriend.

### III.   Discussion

Mr. Dancy raises the following grounds for suppression of evidence:

(1) an invalid Search Warrant was wrongfully authorized for Mr. Dancy's residence; and (2) an unlawful stop of Mr. Dancy's vehicle was conducted and an invalid Search Warrant for his vehicle was subsequently issued. [3] An evidentiary Franks Hearing is requested in support of Defense's motion as Mr. Dancy's constitutional rights were clearly violated because no probable cause existed to support the issuance of the Search Warrants. Thus, executing the searches were unreasonable and unlawful. Moreover, the Warrant Affidavits were supported by allegations displaying a reckless disregard for the truth through information provided by an unreliable informant and a lack of corroboration provided by independent police investigation.

(Def. Motion Brf. p. 4, DE 23)

### A. Probable Cause

Defendant Dancy first argues that the affidavits in support of the search warrants fail to set forth probable cause. Under the deferential standard of *Illinois v. Gates,* I must deny the motion to suppress on these grounds.

The Fourth Amendment requires that, under the totality of the circumstances, the judicial officer who issued the warrants possessed a "substantial basis" to conclude that there was a "fair probability" that contraband or evidence of a crime would be found at the subject premises. *Illinois v. Gates,* 462 U.S. 213 (1983); *United States v. Conley*, 4 F.3d 1200, 1205 & n.2 (3d Cir. 1993). "Great deference" is owed the issuing judge's probable cause determination. *Ornelas v. United States,* 517 U.S. 690, 698 (1996); *Gates,* 462 U.S. at 236–38. That principle rests, in part, on the Constitutional preference for warrants. *See United States v. Ventresca,* 380 U.S. 102, 109 (1965); *United States v. Hodge,* 246 F.3d 301, 305 (3d Cir. 2001) ("'The resolution of doubtful or marginal cases in this area should be largely determined by a preference to be accorded to warrants.'") (quoting *United States v. Jones,* 994 F.2d 1051, 1057–58 (3d Cir. 1993)). Deference serves the policy of encouraging officers to apply for warrants whenever possible, which is what the officers did in this case.

It follows that this Court, on a motion to suppress, is not tasked with performing a *de novo* reassessment of the facts before the judge who issued the warrant. Rather, it is to afford due deference to that judge's determination of probable cause, applying the "substantial basis" standard, *supra.*

The probable cause determination embodies a commonsense conclusion from the totality of the circumstances. As the name implies, probable cause involves probabilities, not certainties, and it is "a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Gates,* 462 U.S. at 231–32.

A search warrant affidavit may be based on hearsay. *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (noting that "direct evidence linking the residence to criminal activity is not required to establish probable cause"); *Jones*, 994 F.2d at 1056–57 ("While ideally every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant."). The

presence of hearsay is a "circumstance . . . for the magistrate judge to consider in determining whether there was probable cause, *see Illinois v. Gates*, 462 U.S. at 230, 103 S. Ct. at 2328." *Id.*

Where, as here, a warrant affidavit cites hearsay information obtained from a confidential informant, the issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the judge], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238–39. An informant's "veracity" and "basis of knowledge" are not rigid, independent prerequisites; rather, *Gates* held, they go into the mix of facts to be considered as part of the "totality of the circumstances." *Id.* at 233 (reversing the prior "*Aguilar/Spinelli*" test which required that both prongs be independently satisfied).

"A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." *United States v. Stearn,* 597 F.3d 540, 555 (3d Cir. 2010). *Gates* itself upheld a warrant based on an anonymous tip from an unknown person, in the form of a letter alerting the police to drug activity and stating that a certain person would be traveling to and from Florida on a particular date to obtain drugs.

A step up from the anonymous tipster, however, is the confidential source who is known to law enforcement and is working with them. Information from such an informant, particularly if he or she has a track record of reliability, does not raise equivalent concerns:

> [The informant's] identity was obviously known to the law enforcement community at the time he proffered the information about the Defendant; thus, this case does not present some of the difficulties often associated with anonymous tipsters.

*United States v. Dennington,* Civ. No. 1:07-cr-43-SJM, 2009 WL 2591763 at *7 (W.D. Pa. Aug. 21, 2009).

The facts in Affidavit #1 clearly set forth probable cause. The basis of CS's knowledge is apparent. CS stated that he twice saw what appeared to be a kilogram of heroin on the premises. CS discussed "cutting" the heroin with Dancy. CS also saw two assault weapons on the premises, and Dancy offered to sell CS "ghost" (*i.e.,* untraceable) guns. Most recently, CS "observed a two-toned gray and black backpack on the kitchen table. The backpack contained one kilogram of suspected CDS-Heroin which was tan in color and inside of a clear zip lock style bag."

It is true, as Dancy points out, that these were not observations of the affiant law enforcement officer, but rather those of the undercover informant, CS. In Dancy's view, there was "no information" about CS's veracity, and CS's information was not sufficiently corroborated.

The information was, however, specific and detailed. CS, the affidavits reveal, was no mere anonymous tipster. The affidavits state that federal agents had been using CS investigatively for seven months. CS had a track record of reliability; his information had led to seizures of a large quantitiy of heroin, firearms, and cash.

The officers obtained some corroboration, in that they verified from public records that "Darryl," the person that CS linked to the residence and the Silverado, was Darryl Dancy. *See United States v. Rivera,* 347 F. App'x 833, 841 (3d Cir. 2009) (corroboration may involve innocent information).[7]

---

[7]    Discussing corroboration of innocent surrounding circumstances in a drug case, *Rivera* explicated the holding of *Gates* thus:

> *Gates* cited approvingly to *Draper v. United States,* 358 U.S. 307, 79 S. Ct. 329, 3 L.Ed.2d 327 (1959), on the issue of corroboration. There, an informant reported that Draper would arrive in Denver on a train from Chicago on one of two days, and that he would be carrying a quantity of heroin. The informant also supplied a fairly detailed physical description of Draper, including a prediction that he would be wearing a light colored raincoat, brown slacks, and black shoes, and would be walking "real fast." Police corroborated this information when they observed a man matching this description get off a train arriving from Chicago, walking rapidly while wearing attire matching the tip. Even though these were all facts consistent with innocent activity, the Supreme Court found this to be sufficient corroboration to justify a finding of probable cause because

11

Additional corroboration was sought, and found, in the form of Dancy's long criminal record of six prior arrests, ultimately yielding seven felony convictions. "'The use of prior arrests . . . is often helpful' to establish probable cause, particularly where 'the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover.'" *Stearn,* 597 F.3d at 557 (quoting *United States v. Conley,* 4 F.3d 1200, 1207 (3d Cir. 1993)). Affidavit #1 relates that Dancy's six arrests included multiple narcotics related offenses and two offenses involving unlawful possession of weapons, and that he had been convicted of violent and stolen-property offenses.[8] Dancy's criminal record was thus relevant to corroborate CS's statements that Dancy was dealing in narcotics and illegal firearms (especially untraceable firearms, which are often stolen).

Nor do the circumstances suggest that CS had any motive to fabricate. CS was operating under the supervision of law enforcement; Affidavit #1 relates that on May 20, 2018, at the Dancy Residence, CS "was gathering intelligence for S/A Tyler."[9] CS had to know that his information would likely be used to support a search; in the past his information had led to seizures of heroin, currency and a firearm. Thus CS surely knew that the reliability of his information would be tested by any ensuing search. Any inaccuracy would be

---

the sole material fact remaining to be verified was the presence of heroin. *See Gates,* 462 U.S. at 242–43, 103 S. Ct. 2317 (citing *Draper,* 358 U.S. at 309, 313–14, 79 S. Ct. 329).

*Rivera,* 347 F. App'x at 841.

[8]     As noted above, the six arrests included narcotics-related offenses, terroristic threats, robbery, unlawful possession of weapons, unlawful possession of a weapon for an unlawful purpose, theft, burglary tools, aggravated assault on law enforcement, multiple receiving stolen property offenses, resisting arrest, eluding, and threatening to kill/harm a police animal. Dancy's seven felony convictions were ultimately for conspiracy to commit theft, aggravated assault on law enforcement, receiving stolen property (2), resisting arrest, eluding, and theft.

[9]     Affidavit # 1 states that Dancy was "known" by the police "to distribute large quantities of CDS-Heroin to various individuals (mid level narcotic distributors) from out of the State of New Jersey." It is inferable that this knowledge motivated the investigation, but the nature and source of such "knowledge" is not stated, so I give it little weight.

exposed immediately, jeopardizing CS's position with the officers. *See United States v. Battershell*, 457 F.3d 1048, 1052 (9th Cir. 2006)] (information given by defendant's girlfriend and her sister was deemed highly reliable where, among other things, both women's identities were known to law enforcement such that they would be liable to repercussions if they lied about what they had seen) (cited in *Dennington*, 2009 WL 2591763 at *7).

Considering the totality of the circumstances, and applying the deferential standard of *Gates,* I find that Judge Ali's finding of probable cause to search the Dancy Residence based on Affidavit #1 had a sufficient basis. And, looking ahead, even if the case were considered a close one, the officers acted in good faith. *See* Section III.C, *infra.*

### B. The Motor Vehicle Stop and Search

Shortly after the Dancy Residence search, officers pulled over the 2015 Silverado and arrested Dancy. Dancy analyzes this as an ordinary investigative traffic stop, which must be based on reasonable suspicion of criminal activity—most commonly a traffic violation. *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)); *see also Rodriguez v. United States,* 575 U.S. ___, 135 S. Ct. 1609, 1614 (2015)*; Knowles v. Iowa,* 525 U.S. 113, 117–18 (1998); *United States v. Mosley,* 454 F.3d 249, 252–56 (3d Cir. 2006) (surveying case law). Alternatively, he argues that this was an invalid detention of a premises owner incident to the execution of a search warrant. *See Michigan v.* Summers, 452 U.S. 692 (1981).

It was neither. Dancy was not present for the execution of the Dancy Residence Search Warrant. When Dancy was arrested, the search of his residence had already occurred. The officers now knew that the search had vindicated CS's statements, which implicated Dancy in illegal drug and weapons trafficking. The search had yielded assault rifles, handguns, a sawed-off shotgun, silencers, large capacity magazines, rounds of ammunition, approximately $22,000 in cash, CDS packing materials, 200 glassine envelopes containing heroin, and 210 grams of raw heroin. Utility and motor vehicle

records established that both the premises and the Silverado belonged to Dancy, who already had a long criminal record. Not surprisingly, the officers immediately went looking for Dancy. They found him driving the Silverado in Irvington, not far from his residence.

The reason for stopping the Silverado, then, was to arrest Dancy, based on strong evidence of criminality. There was clearly probable cause for such an arrest, and Dancy does not really contend otherwise.[10]

The police did arrest Dancy, and they impounded the Silverado. They did not immediately search the Silverado, but instead returned to Judge Ali and obtained a search warrant for the Silverado, as well as for the Rahway Residence.[11]

---

[10]    For cases, like the one here, involving warrantless arrests, we have recently stated the standard as follows:

> Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested.... "[T]he determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed."

[*United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)] (quoting *United States v. Glasser*, 750 F.2d 1197, 1206 (3d Cir. 1984)); *see also Beck v. Ohio*, 379 U.S. 89, 96, 85 S. Ct. 223, 13 L.Ed.2d 142 (1964). Although "probable cause must ultimately be decided by the courts, not the police," *Myers*, 308 F.3d at 255, we must take care to "remember that police officers may well 'draw inferences and make deductions ... that might well elude an untrained person.' " *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981)).

*United States v. Holmes*, 69 F. App'x 66, 67–68 (3d Cir. 2003)

[11]    Dancy does not appear to challenge the search of his girlfriend's Rahway Residence. Such a challenge would face formidable obstacles. To begin with, law enforcement officers observed contraband in the residence firsthand. The officers were admitted to the apartment with the consent of the person living there. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041 (1973); *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974). Dancy would also have to establish that a search of an apartment not owned or controlled by him violated his Fourth Amendment rights. *Minnesota v. Carter*, 525 U.S. 83, 87, 119 S. Ct. 469, 472 (1998 (analyzed as

That warrant was supported by probable cause. Affidavit #2, submitted in support of the warrant for the Silverado, first recapped the information in Affidavit #1. (*See* pp. 3–5, *supra*.) The affidavit went on to report the results of that search of the Dancy Residence, which had produced evidence, including narcotics and guns, demonstrating that Dancy was a dealer in illegal narcotics and guns. In addition, it cited the officers' observations of guns and narcotics distribution paraphernalia in the Rahway Residence where, according to the girlfriend, Dancy had just been. Affidavit #2 also recited that when Dancy was apprehended in the Silverado, he made an incriminating statement: "I got nothing left just two (2) bricks. You already hit my house." That statement is plausibly interpreted as an admission that Dancy still retained two bricks of heroin, separate and apart from the heroin at his residence.

These facts established sufficient probable cause for the search warrant insofar as it related to the Silverado.[12]

### C. *Leon* and Good Faith

In the alternative, I would deny the motion to suppress because the officers relied in good faith on the search warrant issued by a neutral and detached magistrate. *See United States v. Leon,* 468 U.S. 897, 104 S. Ct. 3405 (1984).

The good faith exception may bar application of the exclusionary rule "even though no probable cause to search exists." *United States v. Mortimer*,

---

substantive Fourth Amendment issue); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421 (1978) (analyzed as a standing issue).

[12]     Alternatively, discovery of the contraband in the Silverado was probably inevitable. *See generally Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *Nix v. Williams,* 467 U.S. 431, 443–444, 104 S. Ct. 2501 (1984) ("inevitable discovery" doctrine). The officers here commendably applied for and obtained a warrant. They would have been authorized, however, to perform a warrantless inventory search of the impounded Silverado pursuant to established procedures. *See Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S. Ct. 2605 (1983). Alternatively, they might have performed a warrantless search of the vehicle, or at least its passenger compartment, incident to arrest. *See Riley v. California*, 573 U.S. 373, 384–85, 134 S. Ct. 2473, 2484 (2014).

387 F. App'x 138, 2005 WL 318650 (3d Cir. 2005) (quoting *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001) (internal quotations omitted)).

> Under *United States v. Leon*, when an officer acts in the objectively reasonable belief that his conduct does not run afoul of the Fourth Amendment, the marginal benefits from suppressing the evidence do not match up to the substantial costs of excluding it. 468 U.S. at 922. In deciding whether the good faith exception applies, we ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. $92,422.57*, 307 F.3d 137, 145–46 (3d Cir. 2002) (quoting *United States v. Loy*, 191 F.3d 360, 367 (3d Cir. 1999)).

*United States v. Gallo*, 110 F. App'x 265, 269–70 (3d Cir. 2004).

The "good faith exception" is at its zenith when the officer, as the officers did here, seeks the authorization of a judicial officer by applying for a search warrant. "[T]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Hodge*, 246 F.3d at 307–08; *accord United States v. Mortimer*, 387 F. App'x 138, 2005 WL 318650 (3d Cir. 2005); *Gallo*, 110 F. App'x at 269–70 (3d Cir. 2004).

Still, an officer's reliance on a warrant may be found unreasonable under four limited circumstances:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) [when] the magistrate judge abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or
>
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Gallo*, 110 F. App'x at 269–70 (citing *Hodge,* 246 F.3d at 308).

16

As for the second circumstance, there is not the slightest indication that the state judge who issued the warrant abandoned his neutral role. As for the fourth circumstance, there is no substantial contention that the warrant inadequately described the Dancy Residence or the items to be seized.

The third circumstance posits an affidavit not merely lacking in probable cause, but *so* lacking that the police officer should have known better than to rely on it. The worst that can be said of Affidavits #1 and #2 is that they presented a debatable or close call. I have already analyzed them and found that they set forth probable cause. These were not mere "bare bones" recitals of legal or factual conclusions; they were recitals of historical fact, based on an eyewitness account and other information. *See Gallo,* 110 F. App'x at 269–70 ("As our probable cause analysis has already shown, [the government's] affidavit 'was not a bare bones document' but contained sufficient indicia of probable cause to support [the district justice's] finding of probable cause. . .  Once the [district justice] made that call, it was objectively reasonable for the officers to rely on it." (quoting *Hodge,* 246 F.3d at 309). *A fortiori,* these affidavits were not so weak that the law enforcement officers should have second-guessed the judge's assessment.

That leaves the first circumstance: a warrant based on a deliberately or recklessly false affidavit. I discuss that circumstance in Section III.D, immediately following.

### D. *Franks* Hearing

Finally, Dancy seeks a *Franks* hearing as to what he says is false information in the search warrant affidavits. *See Franks v. Delaware*, 438 U.S. 154 (1978). Generally speaking, a court will presume the validity of information in a search warrant affidavit of probable cause. *See United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). Under limited circumstances, however, that

17

presumption can be overcome, and the defendant may challenge the truthfulness of statements in the affidavit. *Id.* A twofold showing is required.

First, a defendant who seeks a *Franks* hearing must "make a 'substantial preliminary showing' that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit." *Pavulak*, 700 F.3d at 665 (citing *Franks*, 438 U.S. at 155–56). Such a showing must include "an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." *Id.*

Second, the defendant must "demonstrate that the false statement or omitted facts are 'necessary to the finding of probable cause.'" *Pavulak*, 700 F.3d at 665 (quoting *Yusuf*, 461 F.3d at 383–84).

No such showing is proffered here. The defendant submits no affidavit, statement, or even a proffer of evidence that the statements in the affidavit were false—or, more to the point, that the affiant knew of or was reckless with respect to their falsity.

Chiefly, Dancy claims that there was "no evidence" of CS's reliability. The affidavits, however, state that CS had worked with the federal authorities for seven months, that his information had proven reliable, and that it had resulted in prior seizures of heroin, money, and a firearm. Defendant offers no facts to suggest this was untrue, or that the affiant had any reason to think so.

Dancy repeats his earlier contention that there was insufficient corroboration of CS's statements. Again, however, this falls far short of evidence that the statements were untrue, or that the affiant recklessly disregarded their untruth. Dancy essentially criticizes the thoroughness of the officers' investigative techniques. He states that if the officers had investigated further before seeking the search warrant, they could have reduced their reliance on the statements of the CS. It is far from clear, however, that the officers could have gained first-hand access to Dancy or his residence. Moreover, much of the contraband they were seeking was Dancy's stock in trade; it was likely to be moved or sold. The officers' decision to act when they

did, based on the information they had, falls far short of knowledge or recklessness with respect to the truth of CS's statements.

Dancy complains that there was insufficient explanation of an earlier search warrant obtained on June 4, 2018. That earlier warrant, apparently never executed and not at issue here, is irrelevant to the issue of whether there was a sufficient basis for the warrant that is at issue here. (The warrant at issue was obtained later, after CS had returned to the premises on June 15, 2018, and obtained further evidence.)

The only actual inaccuracy Dancy points to is in reference to a .223 rifle seized at the Rahway Residence. This he appears to cite as general evidence of "recklessness," because, as he acknowledges, it has no bearing on the probable cause showing for either search warrant.[13]

The necessary *Franks* showing of reckless or intentional falsehood—which overlaps the finding necessary to pierce the good faith exception—has not been made here.

---

[13]    This challenge seems to be directed, not at the search warrant affidavits, but at the lack of evidence to support part of the charge in the original indictment:

> *Apart from the Search Warrant*, a clear reckless disregard for the truth can be exhibited in the U.S. Government's actions to indict Mr. Dancy. With regard to the Indictment, one of Mr. Dancy's charges included possession of a .223 caliber semiautomatic rifle. Yet, this firearm was not at all included in the Return of Search Warrant, upon execution of said Warrant on Mr. Dancy's residence—located at [redacted] Irvington, New Jersey. Rather, that exact firearm appears on the Return of Search Warrant for the other residence—located at [redacted] Rahway, New Jersey. The U.S. Government has absolutely no basis to charge Mr. Dancy for a firearm that was not discovered and seized inside of his residence.

(DE 23, Def. Brf. pp 23–24 (*emphasis* added)) A *Franks* challenge relates to the information submitted to obtain a warrant; any later inaccuracy in describing the items seized as a result of the search warrants is irrelevant to the inquiry.

The Rahway Residence search and the inventorying of the items seized necessarily occurred after the government made its probable cause showing and obtained the search warrants, and any error in charging occurred after that. The government implies that any such charging error has been corrected in the Superseding Indictment (belatedly, for scheduling reasons), but in any event it does not implicate the *Franks* analysis. (*See* Gov't Brief 16, DE 24.)

## ORDER

Accordingly, for the reasons expressed above,

**IT IS** this 24th day of June 2020,

**ORDERED** that the defendant's motion to suppress evidence (DE 23) is **DENIED**.

/s/ Kevin McNulty

_____

**KEVIN MCNULTY, U.S.D.J.**