UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

———————————————————

UNITED STATES OF AMERICA,

      v.

DARRYL DANCY,

             Defendant.

———————————————————

---

**DEFENDANT DARRYL DANCY'S MEMORANDUM OF LAW
IN SUPPORT OF HIS PRE-TRIAL MOTIONS**
_____

Daniel Holzapfel, Esq.
Stacy Biancamano, Esq.
BIANCAMANO LAW, LLC
42A North 20th Street
Kenilworth, NJ 07033
P: (908)325-3023
Attorneys for Defendant Darryl Dancy

## PROCEDURAL HISTORY

On June 19, 2018, Darryl Dancy was arrested and charged in Essex County with various firearms and narcotics offenses following the execution of a search warrant at his residence. Subsequently, on July 6, 2018, Mr. Dancy's Essex County matter was adopted federally when he was charged by Complaint with a single count of being a felon in possession of a firearm in violation of 18 U.S.C. 922(g). More than a year later, on September 17, 2019, Mr. Dancy was indicted on that singular charge. Approximately 3.5 months after the initial indictment, a Superseding Indictment was filed against Mr. Dancy on January 3, 2020, charging 4 additional counts including 3 additional firearms related offenses, as well as a drug offense. To date, Mr. Dancy has served 52 months the equivalent of a 5-year sentence in pretrial custody (60 months x 85%). He now respectfully brings these pretrial motions before the Court seeking various forms of relief including dismissal of the Superseding Indictment.

## PRELIMINARY STATEMENT

Defendant Darryl Dancy ("Dancy") respectfully submits this Memorandum of Law in support of his pre-trial motions seeking: 1) Dismissal of the Superseding Indictment and/or certain counts of the Superseding Indictment; 2) a Franks hearing; 3) disclosure of the CI's confidential source / confidential informant file and/or permitting in camera review of same; 4) production of all discoverable materials in the files of the Essex and Union County Prosecutor's Offices; 5) preservation and disclosure of agents' rough notes and contemporaneous materials; 6) disclosure of grand jury transcripts for both the initial and superseding indictments; 7) early production of Jencks Act materials; 8) early disclosure of 404(b) materials; 9) exclusion/suppression of any pretrial statements by Mr. Dancy; 10) permission to file additional motions and/or supplement motions as the need arises in advance of trial; 11) a hearing on these issues.

## LEGAL ARGUMENT

### I.    Dismissal Based on Pre-Indictment Delay

Pre-Indictment Delay warrants a dismissal with prejudice. Mr. Dancy was arrested on 7/12/2018 and had his initial appearance that same day in front of the Honorable James Clark, U.S.M.J. At that time, Mr. Dancy was charged by way of Complaint with a violation of 18 U.S.C. 922(g). Mr. Dancy was later indicted on the single 922(g) count on September 16, 2019. By that time, more than 30 days of non-excludable time had passed from the date of arrest to the date of the original indictment in violation of Mr. Dancy's due process rights under the 5th Amendment as well as the provisions of the Speedy Trial Act outlined at 18 U.S.C. 3161-3174. Accordingly, we respectfully submit that the charge in the original indictment (Count 5 in the Superseding Indictment) should be dismissed with prejudice.

United States v. Brooks, 687 F.2d 517 (3rd Cir, 1982) makes it clear that a continuance cannot be backdated. As stated in *Brooks*, a court "may not grant an end of justice continuance nunc pro tunc, providing after the fact justification for unauthorized delays. The district court must consider the matter at the outset and determine whether the ends of justice require that the trial be postponed." Other circuits support this position. The 10th Circuit, for example, in United States v. Koeber, 2014 US Dist Lexis 113839 (10th Cir, 2014) has held "that the STA doesn't allow a district court to retroactively grant ends of justice continuances. Congress intended that the decision to grant an ends of justice continuance be prospective, not retroactive. An order granting on that ground must be made at the outset of the excludable time." United States v. Kifwa, 2020 US Dist. LEXIS 18141, 2020 WL 5913987 (1st Cir, 2020) -"the second, third, fourth, seventh, and tenth circuit all state clearly that the "ends of justice" exclusion can operate only prospectively. See Tunnessen, 763 F.2d 74, 77 {2nd Cir. 1985)."

3

After Mr. Dancy's arraignment on July 12, 2018, no continuance was granted until 8/6/18. The continuance granted on 8/6/2018 excluded time from 8/1/2018 to 9/ 12/2018.  This was signed 5 days after the beginning of the continuance. Another continuance was subsequently granted on 9/10/2018, which excluded the time from 9/6/2018 to 11/12/2018. Again, this was signed 4 days after the beginning of the continuance, however as the two continuances overlapped, no additional non-excludable days were accumulated.

**Time Accumulated from 7/12/2018 to 8/1/2018 = 20 non-excludable days.**

**Time Accumulated from 8/1/ 2018 to 8/6/2018 = 5 non-excludable days** [Total Time accumulated through 11/12/2018 = 25 days]

Another continuance was docketed on 11/20/2018, which excluded the time from 11/20/2018 through 1/16/ 2019.

**Total Accumulated from 11/12/2018 to 11/20/ 2018 = 8 non-excludable days** [Total Time accumulated through l/16/2019 = 33 days]

Another continuance was docketed on 1/22/2019, which excluded the time from 1/18/2019 to 3/18/2019.

**Time Accumulated from 1/16/2019 to 1/22/2019 = 6 non-excludable days** [Total Time accumulated through 3/18/2019 = 39 days]

Another continuance was granted on 3/13/2019, which excluded the time from 3/13/2019 to 5/17/2019.

Another continuance was granted (retroactive) on 5/20/2019, which excluded the time from 5/16/2019 to 7/17/2019.

**Time Accumulated from 5/17/2019 to 5/20/ 2019 = 3 non-excludable days** [Total Time accumulated through 7/17/2019 = 42 days]

**Time Accumulated from 9/10/2019 to 9/17/2019 = 7 non-excludable days** [Total Time accumulated through 9/17/2019 = 49 days]

The Speedy Trial Act requires the government to indict or file an information against a defendant within 30 days of them being arrested. In Mr. Dancy's case, as demonstrated by the calculations outlined above, that date would have been 11/19/2018, almost exactly 4 years ago. By the time Mr. Dancy was ultimately indicted for the first time on 9/17/2019, exactly 49 days of non-

excludable time had accumulated, 19 more days than 18 U.S.C. 3161 and the Speedy Trial Act allow.

The timing of the indictment is important not only for the fact that it occurred 19 days too late, but also for its relation to the investigation, charging, and flight of CW1 who we now know was being investigated through much of the pendency of Mr. Dancy's case. CW1 was charged on September 30, 2019, just two weeks after Mr. Dancy's indictment. Notably, Mr. Dancy was still only indicted on a single count of 922(g) despite only ever having been offered a plea that would have required him to accept a sentence that was years higher than the 10-year statutory maximum on a 922(g) charge. This highlights what appears to have been an effort by the government to force a plea from Mr. Dancy prior to the obvious loss in credibility of a CW who is not only charged federally but a fugitive from justice. It also appears that the government sought to save itself some work by attempting to have Mr. Dancy accept responsibility for conduct they had not charged. Of additional importance, is the fact that Mr. Dancy's case was adopted from Essex County where he had already been charged with all of the alleged conduct leaving no doubt that the government's decision to only charge a 922(g) and subsequently indict on that charge alone was a conscious one, and aside from a desire to avoid the additional work of formally charging the other conduct or – lending truth to Mr. Dancy's prior counsel's assertion – intending for those other charges to remain at the state level, there appears to be no valid reason that the additional charges were not brought as part of the original indictment. Accordingly, while we will also address post-superseding indictment delays below, we respectfully submit that based on initial plea negotiations in this case which accounted for then uncharged conduct, the speedy trial clock as to all counts should be measured as though all counts of the superseding indictment were part of the initial complaint.

We respectfully submit that to the extent the Court does not find any explicit Speedy Trial violation, Federal Rule of Criminal Procedure Rule 48(b) along with the court's supervisory powers provide authority to dismiss indictments, and when warranted, to dismiss with prejudice. Id.; Fed.R.Crim.Pro. Rule 48(b); see also United States v. Dreyer, 533 F.2d 112, 113 n. 1 (3d Cir. 1976) (noting that Rule 48(b) is a "restatement of the court's inherent power to dismiss a case for want of prosecution."). We respectfully request that to the extent the Court does not find dismissal appropriate pursuant to the Speedy Trial Act, that the Court consider dismissing the superseding indictment pursuant to R. 48(b) in consideration of the totality of the circumstances in Mr. Dancy's case.

## II.      Dismissal Based on Post-Indictment / Post-Superseding Indictment Delay

United States v. Jimenez-Mendez, 2021 US Dist. Lexis 33763 (3rd Cir, 2021) explains: "The Superseding Indictment does not reset the speedy trial clock for any charges in the original indictment. Accordingly, this Court's calculations are based on the original Indictment. Accord United States v. Stevenson, 832 F.3d 412, 419 n.4 (3d Cir. 2016). Accordingly, for purposes of the 922(g) count the speedy trial timeframe is calculated from September 16, 2019. We respectfully submit that given the implications of early plea negotiations in this case that the speedy trial clock with respect to all counts should run from September 16, 2019, however, for illustrative purposes we will calculate the timeframe with respect to the additional 4 counts from the date of the superseding indictment, January 5, 2020.

**Time accumulated from 1/26/2020 to 2/4/2020 = 9 days**

**Time accumulated from 8/5/2021 to 8/9/2021 = 4 days**

**Time accumulated from 10/1/2021 to 10/4/2021 = 3 days**

**Time accumulated from 4/1/2022 to 5/4/2022 = 30 days**

**Time accumulated from 5/30/2022 to 7/29/2022 = 60 days**

In view of the foregoing, Mr. Dancy respectfully submits that 106 non-excludable days have accumulated since the superseding indictment was filed against him nearly 3 years ago, 36 days more than the 70 permitted between indictment and trial pursuant to the Speedy Trial Act. Accordingly, Mr. Dancy respectfully submits that the remaining counts should be dismissed. *See* United States v. Tinklenberg, 563 US 647, 646, 131 S.ct. 2007 (dismissing with prejudice defendant's indictment for federal drug and gun charges after calculating 76 non excludable days finding that re-prosecution would be contrary to justice when the defendant had already served his sentence.)

"The Speedy Trial Act does not specify whether dismissal should be with or without prejudice, nor does it contain a default presumption one way or the other." United States v. Robinson, 389 F.3d 582, 586 (6th Cir. 2004). To determine whether the dismissal should be with or without prejudice, the court must consider, among other factors, "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a re-prosecution on the administration of this chapter and on the administration of justice." 18 U.S.C. 3162(a)(2). "Where, as [in section 3162(a)(2)], Congress has declared that a decision will be governed by consideration of particular factors, a district court must carefully consider those factors as applied to the particular case and, whatever its decision, clearly articulate their effect in order to permit meaningful appellate review." United States v. Taylor, 487 U.S. 326, 336, 108 S. Ct. 2413, 101 L. Ed. 2d 297 (1988); United States v.Stevenson, 832 F.3d 412, 419 (3d Cir. 2016) (quoting Taylor, 487 U.S. at 336)).

In <u>Taylor,</u> the Supreme Court identified the presence or absence of prejudice to the defendant as a relevant factor. 487 U.S. at 334. Mr. Dancy respectfully submits that this Court should therefore analyze the three statutory factors as well as prejudice to Defendant, because the Third Circuit analyzes prejudice as a component of the third statutory factor, <u>Stevenson</u>, 832 F.3d at 422.

<u>United States v. Noble</u>, 509 F. Supp 3d 399 (WD PA, 2020) - "The Act controls the conduct of the parties and court itself during criminal pretrial proceedings. <u>United States v. Pringle</u>, 751 F.2d 419, 429 (1st Cir, 1984).  The Act is as much aimed at the delay caused by judicial congestion and management as it is aimed at deliberate stalling by counsel."

### a. Seriousness of the Charges

Mr. Dancy respectfully submits that this is not a complex case. Mr. Dancy represents that the lack of complexity was noted by the government during his arraignment on the superseding indictment. To the point of the case's simplicity, the charges are all possessory in nature and involve just one defendant, Mr. Dancy. Further, in terms of the seriousness of these matters, these matters were initially charged at the county level, a co-defendant charged with similar offenses stemming from the investigation in a different county was allowed to participate in the Pretrial Intervention Program in lieu of prosecution, and for nearly two years following Mr. Dancy's arrest he was charged with just a single count of being a felon in possession of a firearm in violation of 922(g).

<u>United States v. Lo Franco</u>, 620 F. Supp. 1324; 1985 U.S. Dist. LEXIS 14540 (ND NY, 1985) made it clear that "The fifth amendment protects against deprivation of liberty without due process of law. It is a violation of due process to imprison a defendant for a crime without a trial. Because

the fifth amendment refers not only to sentences upon conviction, but to all deprivations of liberty, holding a defendant without bail for longer than he would serve if tried and convicted must also violate due process."

### b.  *Facts and Circumstances that Led to Dismissal*

Mr. Dancy respectfully submits that the facts and circumstances which led to dismissal are attributable to the Government and not to Defendant. Mr. Dancy submits that on or about March 13, 2019, an email was sent to the defendant's prior attorney making it clear that he does not want any more continuances signed. While he has consented at Counsel's request to some of the continuances in this case, Mr. Dancy notes that he has never requested one himself in the 4 plus years that he has been held in pre-trial detention. Mr. Dancy submits that in August of 2019 he advised subsequent counsel not to sign any more continuances and asked her for a trial date. Mr. Dancy was subsequently indicted the following month in September of 2019. Mr. Dancy was superseded in January 2020 and trial was scheduled for April 2020. Notably, in relation to the prior trial date the Court entered a scheduling Order requiring the government to turn over all discovery by October 26, 2019, which Mr. Dancy submits was ignored by the government.  Mr. Dancy submits that discovery was not turned over until December 2020, 14 months after it was initially Ordered to be provided to him. Mr. Dancy submits that he has reason to believe that there are additional discoverable materials under Rule 16 likely in the possession of the Essex County Prosecutor's Office, which would have been turned over to the US Attorney's Office and should have been disclosed to him i.e. (S/W affidavit for storage unit, photos of his storage unit, photos of his truck, etc.)

While Covid-19 caused the trial to be cancelled, no continuances up to that point were attributed to Mr. Dancy.  Mr. Dancy has now been in custody for what would amount to a sentence

of half a decade. As such, he respectfully submits that this factor weighs in favor of dismissal with prejudice.

### c.  The Impact of a Re-prosecution on the Administration of the Speedy Act and on the Administration of Justice

Defendant submits that he was severely prejudiced by the delay in that he had scheduled trial at a time when the events were fresh in his mind and he had several witnesses that were available to support the facts related the case. For example, the other person in the case, CW1, has since disappeared and is not available for testimony.

Mr. Dancy started receiving discovery over 11 months after his arrest through the state case of his significant other in Union County and did not get any evidence, affidavits or probable cause findings from the federal government under Rule 16 for over 30 months from the date of his arrest. By this time the surveillance video that would have supported Mr. Dancy's version of the facts provided in the affidavit for the search warrant had long been over written.  Mr. Dancy strongly believes that these surveillance videos would undoubtedly contradict the version of events described in the affidavit of the search warrant.  Proof of counter-surveillance [home security camera] is mentioned in ECPO NTF operational plan [Exhibit A]. Surveillance video is more accurate than a witness' recollection of events. Prejudice can be found in the loss of key witness' memory, the inability to locate a witness, or the loss of exculpatory evidence.  Here, the loss of surveillance video is equivalent to, if not greater than the loss of an only existing eyewitness and loss of exculpatory evidence combined.

The video would have shown that CW1 was not at the defendant's home on the dates mentioned in the affidavit of probable cause. It would show that the informant was not even there "on or about" those dates.

The affiant didn't even confirm the CI's presence in the affidavit. The affiant only made the assertion that the informant was at defendant's home on dates alleged. In other words, there is no confirmation that these interactions ever occurred by any law enforcement. *See* United states v. Watkins, 200 F. Supp. 2d 489; 2002 U.S. Dist. LEXIS 6918 (ED PA, 2002):

In view of the foregoing, Mr. Dancy respectfully submits that all 3 factors weigh in favor of his case being dismissed with prejudice, and respectfully requests that the Court enter an Order to that effect.

### III.     6th Amendment Due Process Violation Warrants Dismissal with Prejudice

The Court should dismiss this case due to a violation of his rights under the Sixth Amendment of the United States Constitution because the relevant factors weigh in his favor.

In relevant part, the Sixth Amendment guarantees the accused "the right to a speedy and public trial." U.S. CONST. amend. VI. "Congress enacted the Speedy Trial Act to 'give effect to the Sixth Amendment right to a speedy trial' by setting specified time limits after arraignment or indictment within which criminal trials must be commenced." United States v. Rivera Constr. Co., 863 F.2d 293, 295 (3d Cir. 1988) (citing H.R. Rep. No. 1508, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 740 1, 7402). Thus, the protections of the Speedy Trial Act "exceed those of the Sixth Amendment, which does not require that a trial commence within a specified time." Lattany, 982 F.2d at 870 n.5.

The Court outlined a four-part balancing test in <u>Barker v. Wingo</u>, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d  101 (1972), to assess the merits of speedy trial claim. <u>United States v. Dent</u>, 149 F.3d 180, 184 (3d Cir. 1998). An analysis of these factors avoids an "inflexible approach" which would result from applying a fixed-time period in determining whether there has been a constitutional violation and, rather, applies a balancing test "in which the conduct of both the prosecution and the defendant are weighed." <u>Barker,</u> 407 U.S. at 529-530.

The factors that the <u>Barker</u> Court considered included the "[l]ength of delay, the reasons for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id. at 530. "None of these factors is 'either a necessary or sufficient condition,' and the factors 'must be considered together with such other circumstances as may be relevant.'" <u>United States v. Battis</u>, 589 F.3d 673, 678 (3d Cir. 2009) (quoting <u>Barker,</u> 407 U.S. at 533); see also, <u>Hakeem v. Beyer</u>,  990  F.2d  750, 759 (3d Cir. 1993) ("All factors must be considered and weighed as no one factor is dispositive nor 'talismanic.") (citing <u>Barker</u>, 407 U.S. at 533).

### a.  Length of Delay

As an initial matter, the length of delay "is measured from the date of formal accusation, i.e., from the earliest date of arrest or indictment until the commencement of trial." Hakeem, 990 F.2d at 760 (citing <u>United States v. MacDonald</u>, 456 U.S. 1, 6-7, 102 S. Ct. 1497, 71 L. Ed. 2d 696 (1982)). Importantly, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." <u>Barker</u>, 407 U.S. at 530.

The Third Circuit has found a delay of 14 months sufficient to trigger an analysis of the Barker test.  United States v. Velazquez, 749 F.3d 161; 2014U.S. App. LEXIS 6850 (3rd Cir, 2014) - "The United States Court of Appeals for the Third Circuit has concluded that a delay of 14 months is sufficient to trigger review of the remaining Barker factors, and once that threshold has been passed, the State, not the prisoner, bears the burden to justify the delay."

Mr. Dancy has been held in pre-trial detention for 52 months. Even with the 15-month Covid-19 delay, he has still spent 38 months (more than 3 years) in pre-trial detention.  These numbers extensively exceed the 14-month time frame referenced in Vazquez.  Accordingly, an analysis of the 3 remaining factors is warranted.

### b. Reason for the Delay

With respect to the second Barker factor, reason for the delay, the Government "bears the burden to justify the delay," Hakeem, 990 F.2d at 770.

 Barker grouped possible reasons for delay into three categories. A deliberate effort by the Government to delay the trial "in order to hamper the defense" weighs heavily against the Government. Barker, 407 U.S. at 531, 92 S. Ct. 2182. A "more neutral reason such as negligence or overcrowded courts" also weighs against the Government, though "less heavily." Id. This is because "ultimate responsibility for such circumstances must rest with the [G]overnment," since it is the Government's duty to bring a defendant to trial. Id. at 527, 531, 92 S. Ct. 2182. Finally, "a valid reason, such as a missing witness, should serve to justify appropriate delay." Id. at 531, 92 S. Ct. 2182. Battis, 589 F.3d at 679-680.

In turn, "delays attributable to the dilatory actions of the defendant cut against a finding of a Sixth Amendment violation." Hakeem, 990 F.2d at 766. See also, Battis, 589 F.3d at 680 ("By contrast, 'delay caused by the defense weighs against the defendant' . . .") (quoting Vermont v. Brillon, 556 U.S. 81, 90, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009)).

It is Mr. Dancy's position that aside from a single motion filed by his prior attorney, which occurred while a continuance was in place, no delays are attributable to him. As discussed, even with the Covid- 19 delays removed, Mr. Dancy has been in pre-trial incarceration for 38 months. Accordingly, Mr. Dancy respectfully submits that this factor weighs significantly in favor of a dismissal WITH prejudice.

c. *Assertion of Speedy Trial Rights*

The third Barker factor is the defendant's assertion of his right to a speedy trial. "Whether and how a defendant asserts his right [to a speedy trial] is closely related " to the other Barker factors. Barker, 407 U.S. at 531. "[T]he point at which the defendant asserts his right is important because it may reflect the seriousness of the personal prejudice he is experiencing." United States v. Palmer, 537 F.2d 1287, 1288 (5th Cir. 1976) (citing Barker, 407 U.S. at 531).

 The record is extensive as it relates to this factor that the defendant has asked for a trial, even to the extent that he had a scheduled trial date for April 23, 2020.  He had not known about the cancellation of the trial until the covid-19 standing orders began, about 1month prior to trial. Furthermore, Mr. Dancy had dozens upon dozens of communications by email records and by phone to his counsel asking to stop the continuances. Additionally, see letter at Dkt. 43 which Mr. Dancy represents was a reassertion of his speedy trial rights. Again, in view of the foregoing Mr. Dancy respectfully submit that this factor weighs in favor of dismissal with prejudice.

### d. Prejudice to Defendant

With respect to the fourth <u>Barker</u> factor: prejudice to the defendant, "the burden of showing prejudice lies with the individual claiming the violation. " <u>Hakeem</u>, 990 F.2d at 760.

As directed in <u>Barker</u>, the prejudice factor "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." 407 U.S. at 532. <u>Barker</u> identified and explained the three interests which the Supreme Court has identified:

*(i) to prevent oppressive pretrial incarceration.*

*(ii) to minimize anxiety and concern of the accused; and*

*(iii) to limit the possibility that the defense will be impaired.*

Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system and the proper administration of justice. If witnesses die or disappear (as has happened here) during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

> "We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been

convicted is serious. Finally, even if an accused is not incarcerated prior to trial, he is still disadvantaged by restraints on his liberty and by living under a cloud of anxiety, suspicion, and often hostility." Barker, 407 U.S. at 532-33.

### (i) prevent oppressive pretrial incarceration

Starting with the first sub-factor, the incarceration suffered in a maximum-security county jail like Essex County has been excessive. Mr. Dancy has endured many situations in his over 4 years of detention that anyone would consider extremely prejudicial. Defendant suffers from severe rheumatoid arthritis and has gone weeks sometimes months without necessary prescribed medication. One of which requires the injection of the "biologic" medication Enbrel weekly. This disease requires constant monitoring of defendant's blood levels and at least 4 Rheumatologist visits yearly. Defendant has seen a specialist only once since his incarceration (52 months) and has suffered physically from the neglect of the medical staff's attentiveness to this debilitating disease. See attached grievance correspondence [Exhibit B]. Mr. Dancy has also lost personal property amounting over $2,000 at the hands of the facility's staff. See attached grievance correspondence [Exhibit B].

Bell v. Wolfish, 441 U.S. 520 (1979) held that Pretrial detainees constitute a special category of prisoners. It has been generally held that pretrial detainees are entitled to the same rights as other citizens except to the extent necessary to assure their appearance at trial. Furthermore, punishment is not allowed against pre-trial detainees without cause, however all detainees were subject to punishment of severe isolation and exposure to disease during the lockdowns and mass quarantines that occurred as a result of the pandemic. Here, Mr. Dancy's Eighth Amendment rights were violated as punishment was involved without any infraction. Under federal law, punishment is "any fine, penalty, or confinement inflicted upon a person by the authority of the law and the

judgment and sentence of a court, for some crime . . . or for his omission of a duty enjoined by law."

We respectfully submit that the prejudice against Mr. Dancy is readily apparent.

### *(ii) to minimize anxiety and concern of the accused*

Mr. Dancy has a son who was 12 years old when he was arrested. He is now 16 years old. His relationship with his son, at such a crucial time in his son's life has been virtually irreparably damaged. He has suffered mental anguish over his mother 's declining health which he believes is a result of stress experienced due to his being incarcerated in a facility that was recognized during the pandemic as one of America's deadliest county jails. As someone who has been arrest free for most of his adult life the past 4 years have been difficult for Mr. Dancy's family to understand and cope with. Notably, Mr. Dancy has no criminal history points and as such is in Criminal History Category I.

Mr. Dancy's mother suffers from Diabetes, she has lost one eye and toe due to this disease and has heart and high blood pressure issues.  Mr. Dancy had been engaged to marry his fiancé at the time of his arrest.  That relationship has ended.  All his money that was saved has been dissipated and his good credit rating has been destroyed.  He has literally been stripped of everything he ever had in his life. Mr. Dancy started as a young man in ROTC, pre-approved to join the Air Force. He spent 2 years preparing to enter upon graduation.  While he did not take that route, he opened a barber shop of his own "The Showroom" with 8 barber seats and it became a part of the community as one the best in town. Before his arrest Mr. Dancy had recently opened another business "In Living Colour" where he also employed people from the neighborhood.  By all accounts he is an excellent father and someone who truly cared about his community. Mr.

Dancy spent extensive amounts of time giving his time at the children's ward at the University Hospital and was well known by the nurses and administrators. He would collect toys from the community and deliver them to the children. He would also collect food from the community at Thanksgiving and deliver them to the poverty stricken families with children and old members of the community.

All of the relationships, with family, and his community/customers, his businesses, all gone in the nearly half-decade he has spent in custody. A devastating reality for a person who has always worked and who prior to this case had never spent any real time in jail and hadn't been arrested in nearly twenty years. The prejudice to the Mr. Dancy is severe and the anxiety has been extreme.

### (iii) to limit the possibility that the defense will be impaired.

Mr. Dancy has had little or no capability to prepare his case for trial while in custody. The primary witness, CW1, who Mr. Dancy believes would have revealed the misstatements and falsehoods in the warrant affidavit etc., has disappeared. Mr. Dancy has been in a jail with such daily monotony that he can often not even remember what he did the day before, much less to be able to recall the events of 2018 for purposes of trial preparation.

Mr. Dancy believes the prosecution withheld discovery from defense even with a scheduling order in place requiring production by a specified date. The only usable discovery that defense had until December 2020 was through a defendant in a related state case. [Reference Bates stamps U.C.P.0. on exhibits filed for pretrial motions at Dkt. 31]. This tactical advantage forced defendant to file pretrial motions without adequate information.

The evidence took so long to be received by the defendant, that by the time defendant learned about the alleged encounters with the CI at "640 Chancellor Ave.", which led to the issuance of the search warrant, the surveillance video that could have disproven same was already unavailable.

The time to meet with attorneys was suspended for an extended period of time and even once restored, it is still significantly reduced compared to pre-pandemic norms and even more significantly reduced in comparison to the time he would be afforded if he were home on pre-trial release.   Mr. Dancy has felt completely hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense.

In view of the foregoing, we respectfully submit that all 3 factors the Court considers in assessing prejudice to the defendant under Barker are present in Mr. Dancy's case. Accordingly, in conjunction with the sections outlined herein we respectfully submit that the superseding indictment should be dismissed with prejudice.

### IV.    One 924(c) Count (Count 2 or 3) Should be Dismissed

Each 924(c) count requires a separate predicate offense. Here, Mr. Dancy's only predicate offense is the drug offense charged in Count 1. Accordingly, we respectfully submit that either Count 2 or 3 must be dismissed.

In United States v. Diaz, 592 F.3d 467; 2010 U.S. App. LEXIS 954 (3rd Cir., 2010), the defendant sought review of a judgment from the United States District Court for the Middle District of Pennsylvania which convicted him upon a jury verdict on one count of possession with intent to distribute heroin, 21 U.S.C. 841(a)(1), and two counts of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. 924(c). The defendant in Diaz argued that his convictions and consecutive 10-year sentences for the two firearms charges under 924(c) violated

the Double Jeopardy Clause of the 5th Amendment. Although the defendant conceded that there was sufficient evidence to support the heroin distribution count and that he possessed a firearm on at least two occasions, he argued that two consecutive sentences for firearm possession in furtherance of drug trafficking could not be imposed when he was convicted on only one predicate drug trafficking offense. In considering whether the two consecutive terms for the 924(c) convictions constituted greater punishment than the legislature intended, the Court first determined that the predicate offense, not the firearm, was the object of 924(c)(1). The court found that the ambiguity in the text of 924(c) and in its legislative history required the court to apply the rule of lenity and vacate one of defendant's 924(c) convictions. The Court stated:

> "Under the Government's position, there would be no limitation on its ability to charge a defendant with a new 924(c) for each instance in which he used, carried, or possessed a gun as he sold drugs, which, under the statute's "second or subsequent" clause, could quickly add up to life imprisonment. The Second Circuit put it well when it said, "if congress intended to impose such a draconian penalty [,]… surely it would have said so in clear language. Lindsay, 985 F.2d at 674… For the reasons set forth, we will vacate one of Diaz's two 924(c) convictions and remand to the District Court for re-sentencing."

Case law from other Circuits, as well as more recent 3rd Circuit case law, further demonstrate what the Court outlined in United States v. Diaz:

United States v. Lindsay, 985 F.2d 666 (2nd Cir.): "Consequently, we conclude that congress considered the appropriate unit of prosecution to be the underlying drug trafficking offense, not the separate firearms. Only where the defendant commits multiple drug trafficking crimes or violent crimes, and the government can link the firearms to those crimes, may the government prosecute for multiple violations of 924(c)(1). Where the government links multiple firearms for a single crime, only one 924(c)(1) violation occurs."

United States v. Richard Antonio Hodge, Jr., 870 F.3d 184; 2017 U.S. App. LEXIS 17274; 68 V.I. 783 (3rd Cir.): "Unlike the defendant in *Diaz,* who had two 924(c) convictions on the basis of a single predicate crime, Hodge's two 924(c) convictions were based on two separate predicate offenses… This circuit and every other has held that for each separate 924(c)(1)(A) charge it pursues the government must prove a separate crime of violence or drug trafficking crime. See also: Privette**,** 947 f.2d 1259, 1262-63 (5th Cir. 1991); Henry, 878 f.2d 937, 942-45 (6th Cir. 1989); United States v. Hobbs, 612 Fed. Appx. 94, 2015 US App Lexis 7758 (3rd Cir. 2015); United States v. Coles, 586 Fed. Appx. 98 (3rd Cir., 2014)."

United States v. Johnson**,** 899 F.3d 191; U.S. App. LEXIS 21909 (3rd Cir. 2018): "In *Diaz,* we held that the Double Jeopardy Clause requires each 924(c) conviction to be tied to a separate predicate offense. 592 F.3d at 474-75."

In view of the foregoing, we respectfully submit that one of the pending 924(c) counts must be dismissed as they both relate to a single drug trafficking predicate in violation of the Double Jeopardy Clause of the 5th Amendment as outlined in *Diaz* and its progeny.

V.      **Darryl Dancy is Entitled to a *Franks* hearing**

The Fourth Amendment protects individuals from "unreasonable searches and seizures" and requires all warrants to issue only upon "probable cause."  U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."  United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002).  Probable cause is "defined in terms of facts and circumstances 'sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."  Gerstein v. Pugh, 420 U.S. 103, 111 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).  This standard is meant to "'safeguard citizens from rash and unreasonable interferences with privacy'" and to provide

"leeway for enforcing the law in the community's protection."  *Id.* at 112 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).  "A search or seizure of a person must be supported by probable cause particularized with respect to that person."  Ybarra v. Illinois, 444 U.S. 85, 91 (1979).  "[A] person's mere propensity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."  *Id.* (citing *Sibron v. New York*, 392 U.S. 40, 62-63).

The Supreme Court has set forth a "totality-of-the-circumstances" test for determining probable cause to support a search warrant.  Illinois v. Gates, 462 U.S. 213 (1983).  The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* at 289.  The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause.  *Id.* at 236.

In making this assessment, the affidavit is to be construed in its entirety and in a common sense and non-technical fashion.  *Id.* at 230-231.  Importantly, "[s]ufficient information must [have been] presented to the magistrate to allow that official to determine probable cause; his action cannot [have been] a mere ratification of the bare conclusions of others."  *Id.* at 239.  Accordingly, "a mere conclusory statement" in an affidavit "that gives the magistrate virtually no basis at all for making a judgment regarding probable cause" will not suffice.  *Id.*  When the government relies on an informant to establish probable cause, as in this case, the informant's "reliability" and "basis of knowledge" are both "relevant considerations in the totality-of-the-circumstances analysis that

traditionally has guided probable cause determinations: a deficiency in one may be compensated for . . . by a strong showing as to the other." *Id.* at 233.

The Dancy Affidavit lacked probable cause as it failed to establish the reliability and the basis of knowledge of the confidential informant, as required by Gates. In assessing reliability, bare assertions by the affiant that the informant is reliable does not suffice. United States v. Williams, 3 F.3d 69 (3d Cir. 1993). Especially as is the case here, where that assessment is performed second-hand. The court should look to factors such as the informant's history or providing reliable information through prior assistance to the government. United States v. Dunaway, WL 1850866 (3d Cir. 2012) (unpublished) (reliability proven because informant had provided reliable information to the police in the past); United States. v. Wagner, 989 F.2d 69 (2d Cir. 1993) (affidavit may be sufficiently reliable to support a finding of probable cause if the informant has a track record of providing reliable information). Although the Dancy Affidavit relied heavily upon information provided by CW1, there is no indication that he had ever cooperated with the affiant in previous matters or that he previously provided reliable information. Rather, CW1 is a known drug dealer, and we now know that he a fugitive from justice in relation to a separate matter pending in this district, demonstrating that while he was supposedly cooperating with the government and providing "reliable" information he was simultaneously continuing to commit crimes without their knowledge. As such, there is a significant deficiency in the showing of reliability. The Dancy Affidavit makes the conclusory assertions regarding information allegedly provided by CW1 without providing any basis for his knowledge or corroboration of any sort. Again, there is no information provided which indicates the basis of CW1's knowledge.

In <u>Franks v. Delaware</u>, 438 U.S. 154, 164-65 (1978), the Supreme Court determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant.  In order to obtain a <u>Franks</u> hearing, the defendant must first (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are "necessary to the finding of probable cause." <u>United States v. Pavulak</u>, 700 F.3d 651, 665 (3d Cir. 2012).  In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.  <u>United States v. Yusuf</u>, 461 F.3d 374, fn. 8 (3d Cir. 2006) (citing <u>Franks</u>, 438 U.S. at 171).  At the hearing, the defendant must ultimately prove these factors by a preponderance of the evidence.  <u>Id</u>. at 383.

Dancy is entitled to a <u>Franks</u> hearing because he can establish, by a preponderance of the evidence, that probable cause does not exist under the corrected affidavit, i.e., that the deficiency in the affidavit was material to the original probable cause finding.  <u>Wilson</u>, 212 F.3d at 783.  To determine the materiality of the misstatements and omissions, the court must excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause.  <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 400 (3d Cir. 1997).  In assessing the materiality of an omission, the court must remove the "falsehood created by an omission by supplying the omitted information to the original affidavit." <u>Id</u>. at 400.  Here, we have two statements that are critical to the probable cause determination. First, that there was an interaction between Mr. Dancy and the CI at Mr. Dancy's home in September of 2017, and second, that the CI was inside of Mr. Dancy's residence on June

15, 2018 just days prior to the execution of the warrant and at that time observed contraband. Notably, Mr. Dancy did not move into the residence involved in this case until October of 2017 and in September of 2017 was living with his grandmother. Additionally, the CI was in custody in NY at the time he allegedly observed firearms in Mr. Dancy's residence. As to the second statement, text messages produced in discovery corroborate that the CI arranged to go to Mr. Dancy's residence on June 18, 2018, three days after the date claimed in the warrant affidavit. The materiality of these misstated facts is apparent once they are excised from the affidavit of probable cause, as without their inclusion in the affidavit there is no probable cause to be found whatsoever.

(a)     *Affiant presented to the magistrate an alleged interaction in September 2017 between the informant and the defendant, when the affiant knew that defendant did not even live there at that time and therefore it was impossible to have occurred.*

On page 3 of the Affidavit for Search Warrant ("SW Affidavit"), affiant stated:

"Also while inside the apartment on or about September 2017, the CS observed two (2) AR-15 style assault rifles which Darryl related to the CS was made for him by a friend. Darryl further stated that he had another similar rifle in that he could get one for the CS to purchase, which would cost approximately $2,000.00. Both of these weapons, Darryl stated were ghost guns. (Ghost gun - a firearm was manufactured without a serial number is and difficult to trace the weapons origins.) which he obtained from a friend in South Jersey."

This was a known false statement by Officer DeGroot ("DeGroot"), as the officer knew from his investigation that Mr. Dancy did not move into this apartment until after the CS said he observed the above-mentioned rifles. In fact, Mr. Dancy did not move into the apartment until October. [See Text Messages Pg. 1602]. Additionally, the CS was in custody in New York from September 13, 2017, until October 27, 2017. Mr. Dancy got the apartment key on September 17,

2017 and moved in during the month of October. At a minimum, Detective DeGroot's inclusion of a statement that CS saw the 2 weapons at the apartment of "Darryl" demonstrates that false information was recklessly conveyed to the Court in the warrant affidavit.

*(b)    CSLI may confirm that S/A Tyler lied about the alleged interaction by the informant and the defendant on May 20, 2018*

On page 2 of the SW Affidavit, the affiant states:

"On or about May 20, 2018, the CS was gathering intelligence for S/A Tyler in Irvington, NJ, specifically 640 Chancellor Avenue. This location is  a multi-unit townhouse style structure, located on the South side of Chancellor Avenue between Greene Terrace and Martin Place. "640' is the second door from the West side of the building. The front door is maroon in color with the numbers '640' is centered and horizontally positioned at the top of the door and opens inward to the right. There is a glass storm door which opens outward to the right when facing the door. There are three (3) steps concrete steps which lead to the front door."

"While at this location, the CS was conversing with a black male known to the CS as 'Darryl".... "While inside the location the CS observed a kilogram of suspected  CDS-Heroin, to which both  parties  were discussing various ways to cut the CDS-Heroin."

According to the  Affiant, S/A Tyler (a DEA agent from  NY) provided him with this information above, which states in great detail observations made by S/A Tyler and/ or the CS on May 20, 2018. In fact, CW1 had no such interaction on Saturday, May 20, 2018. CSLI data will show that the CW1 was not at the defendant's house on May 20, 2018, nor any day on or about May 20, 2018. Further confirmation can be made from the texts that show that there was no

meeting, nor any scheduled meeting between the CS and the Defendant on or about this date. The only date the CW1 was at the Dancy apartment around this time period was the actual day the warrant was signed (June 18, 2018), after the time stated on the warrant (6:04pm). Text messages corroborate this.

The affiant uses the narrative he received from S/A Tyler to not only deceive the Judge who signed the warrant by presenting an interaction that did not occur, but he describes it in such great detail that it reads as though he observed it himself adding false credibility to bolster information from a less than credible source. In United States v. DeLeon, 979 F.2d 761 (9th Cir. 1992), the Court held that "[a] deliberate or reckless omission by a government official who is not the affiant can be the basis of a Franks suppression." Id. at 764. The Court reasoned that a contrary holding would allow government officials to deliberately or recklessly withhold information from the Court that is material to the determination of probable cause. Accord United States v. Calisto, 838 F.2d 711 (3d Cir. 1988) (contrary ruling would seriously jeopardize Fourth Amendment rights), United States v. Pritchard, 745 F.2d 1112 (7th Cir. 1984) ( Franks also covers a situation where one government agent recklessly misrepresents information to a second agent, who innocently includes false information in affidavit), United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997), United States v. Wapnick , 60 F.3d 948, 956 (2d Cir. 1995), cert. denied, 518 U.S. 1021, 135 L. Ed. 2d 1075, 116 S. Ct. 2556 (1996).

Similarly, even if the affiant were not aware of the false statement by S/A Tyler, the 3rd Circuit has held that the warrant is equally in jeopardy as if he created the false statement himself. Therefore, DeGroot, by way of his reliance on S/A Tyler showed a disregard for the truth by presenting the Court with info indicating that "the CS observed a kilogram of suspected CDS-

Heroin" in the apartment of the defendant on or about May 20, 2018, and therefore this statement must be removed from the warrant affidavit.

### (c) CSLI may confirm the falsity of the alleged interaction by the informant and the defendant on June 15, 2018

On page 2 of the SW Affidavit, the affiant states:

"On or about June 15, 2018, the CS responded the Dancy's residence and observed a two-toned gray and black backpack on the kitchen table. The backpack contained one kilogram of suspected CDS- Heroin which was tan in color and inside a clear zip lock style bag."

Not only does the defendant assert that this event did not happen at all at any time, but CSLI data will confirm that the CS was not at the apartment of Mr. Dancy on June 15, 2018. Further, confirmation can be made from the texts that show that there was no meeting, nor any scheduled meeting between the CS and the Defendant on or about this date. The only date the CS was at the Dancy apartment around this time period was the actual day the warrant was signed (June 18, 20 18), after the time stated on the warrant (6:04pm). Text messages indicate that CS was at the Dancy apartment around 8pm on June 18, 2018. This occurred after the warrant was signed and therefore could not be included in the SW Affidavit.

The affiant uses this narrative to deceive the Judge who signed the warrant by presenting an interaction that did not occur, while presenting it in a manner as if he oversaw or observed it. DeGroot showed disregard for the truth by presenting to the magistrate as if he observed or oversaw the events of this date, while submitting that a "backpack contained one kilogram of suspected CDS-Heroin", an event that he knew did not ever happen, thus, this statement must  be removed from the reformed warrant affidavit. Notably, despite his apparent use by the DEA as an informant there have been no 302s produced to defense counsel relating to law enforcement's

interactions with CW1 or CW1s interactions with Mr. Dancy on the dates the warrant affidavit claims they met. Ordinarily, such materials would exist.

      *(d)     Affiant makes "conclusory allegations" without any support whatsoever of facts or a source.*

      On page 2 of the SW Affidavit, the affiant states:

      "Darryl is known to distribute large quantities of CDS-Heroin to various individuals (mid-level narcotics distributors) from out of the State of New Jersey.At this location Darryl operates an unlicensed barber shop in the rear of the location, and is known to distribute narcotics from this store."

      In <u>United States v. Roman</u>, 942 F.3d 43; 2019 U.S. App. LEXIS 33060 (1st Cir, 2018), the district court granted Roman's motion to suppress.  The court found, among other things, that:

      "The affidavit also alleged that <u>Roman</u> was "a known cocaine trafficker," though it did not identify the source of this information."

      "The statement in the affidavit that Roman was "a known cocaine trafficker" was "conclusory" and lacked evidentiary support."

      Similarly, no support is provided by DeGroot as to Mr. Dancy being "known to distribute large quantities of CDS-Heroin" nor that Mr. Dancy "is known to distribute narcotics from this [his] store."  In <u>Roman</u>, the court held that:

"Accordingly, the district court removed statement[s] that .... <u>Roman</u> was a known cocaine trafficker from the reformed affidavit for lack of evidentiary support."

      "Reliance [is] unreasonable because detective had no personal knowledge of unlawful activity, did not conduct any visual reconnaissance of the area, had only third-party hearsay

information on marijuana growing operation on property, and detective executed the warrant himself." United States v. Ritter, 416 F.3d 256 (3rd Cir, 2005)

DeGroot showed complete disregard for the truth by presenting conclusory statements lacking any independent evidentiary support and therefore these statements must be removed from the warrant affidavit.

*(e)     Affiant states that he corroborated the CS's statements by verifying PSE&G records, while this was never done.*

On page 4 of the SW Affidavit, the affiant states:

"A PSEG check of 640 Chancellor Avenue, Irvington, New Jersey was sent to PSEG and yielded Darryl Dancy as the subscriber for said address."

The defense contacted PSE&G's legal department in 2020 and they unequivocally stated that there was no subpoena, court order or grand jury subpoena ever submitted for these records. The New Jersey Constitution and case law holds that utility records can only be obtained with a court order or grand jury subpoena. Therefore, no records were ever obtained and this statement was to intentionally deceive the magistrate judge. State v. Randolph, 441 N.J. Super. 533, 120 A.3d 237, 2015 N .J. Super. LEXIS 126 (20 17)

"[T]he State must serve a grand jury subpoena to secure an individual's subscriber information from an Internet service provider, electric utility records, or bank records. Having decided in those then-novel cases that individuals have a protectable N.J. Const. Article I, para. 7 possessory or proprietary interest, future grievant's in criminal cases have automatic standing to challenge a search or seizure of those records not secured by constitutional means. HN27 - "NJ State Law, therefore, does not allow police officers [to] simply contact a service provider and ask for those records."

In <u>State v. Domicz</u>, 188 NJ 285 (2006), the Court held:

"[A] grand jury subpoena was sufficient to protect any privacy interest in an individual's utility records." "The Court thus found no basis to treat utility records differently from bank records. It upheld the use of a grand jury subpoena to obtain utility records and did not require the police to secure a warrant."

Detective DeGroot showed complete disregard for the truth by including a statement in his warrant affidavit which indicated falsely (or by unlawful means) that he had corroborated the CS's statements by conducting "a PSEG check of 640 Chancellor Avenue". "When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1260 (D. NM, 2021).

For these reasons, this statement must be removed from the warrant affidavit.

**(f)    *Affiant included false information on sworn evidence reports, other search warrant affidavits and a state complaint warrant showing an overall lack of truthfulness and putting his trustworthiness in question.***

An affiant's truthfulness can be tested by his overall truthfulness in all matters on the record with the court.

*(i)      Affiant indicated a silencer was attached to a ghost gun, when photographs indicate the firearm was disassembled*

In the Essex County "Complaint - Warrant", John DeGroot certifies "I certify that the foregoing statements made by me are true.  I am aware that any of the foregoing statements made by me are willfully false, I am subject to punishment. Signed John DeGroot, 6/19/2018."  Within this Complaint  he  states: "Within the jurisdiction of this court, Darryl Dancy knowingly and purposely did have in his possession one suppressor (silencer) located *on* a[n] assault rifle "ghost gun". In violation of 2C:39-3(c) A 4th degree crime." In reality, as Detective DeGroot should be aware having been present during the execution of the search warrant, the silencer was not actually on the rifle but was stored in the same box unattached to the rifle." [See Photos 2 & 9]. This misinformation is not only false, but highly inflammatory as a firearm that is assembled and ready to shoot creates a more significant danger issue than a dissembled firearm.

*(ii)      Affiant lied that the KTC rifle had a silencer attached, when it had no existing silencer whatsoever.*

Within this same Complaint DeGroot states:

"Within the jurisdiction of this court, Darryl Dancy knowingly and purposely did have in his possession one suppressor {silencer) located on one KTC Assault rifle, model "PLR16", serial#POK58, .223 Caliber... in violation of 2C:39-3(c) a 4th degree crime."

A second time, DeGroot fabricated evidence and stated that a silencer was on the KTC rifle, when as the discovery materials corroborate, there was no silencer associated with this firearm.

*(iii)      Affiant misstates where drugs were found in the Dancy residence*

The affiant falsely states that the drugs collected were found in *the attic*, to try to infer that they were found *near* firearms, when in truth they were found two floors down from the attic, in the kitchen cabinet. This falsely creates a nexus between the firearms and the drugs that otherwise would not exist. The crime scene photos clearly depict the location that the drugs were found.

*(iv)* **There is a discrepancy among different case documents regarding the location that the defendant's girlfriend's firearm was found**

In the search warrant affidavit for the search of 790 HP, the residence of Mr. Dancy's girlfriend P.R., DeGroot states that while Detective Gonzalez was at PR's house looking for Mr. Dancy: "Detective Gonzalez also *observed under Russ' s bed a loaded .45 caliber Glock handgun* which was later determined to be registered to PR." However, in the "Essex County Prosecutors Office Continuation Report", DeGroot states: "Russ informed Detective Gonzalez that she has a registered gun in a locked case under her bed. Detective Gonzalez recovered the box and *PR voluntarily opened the finger-coded combination box, which revealed loaded .45 caliber Glock* handgun which was later determined to be registered to Russ."


Detective DeGroot again includes inflammatory information in the affidavit of the warrant to search PR's apartment by suggesting that Detective Gonzalez saw a gun in "plain view", while his report to the Prosecutors office indicates something completely contradictory.

*(g) Officers use an impermissible single photo identification procedure to support the corroboration of the CS's identification of Mr. Dancy*

On page 3 of the SW Affidavit, the affiant states:

"A photograph was then provided to the CS who positively identified Dancy as the individual whose house he/ she was in and observed the previously mentioned narcotics and weapons."

"Courts have concluded that showing a witness only one photograph is unduly suggestive." United States v. Henry, 939 F. Supp. 2d at 1292 (ND GA, 2013) (listing cases). See also: Manson v. Brathwaite, 432 U.S. 98, 108-09, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984). The use of this unduly suggestive identification method is simply an attempt to corroborate one conclusory statement with another.

In view of the foregoing, we respectfully submit that Mr. Dancy has made a substantial preliminary showing that at a minimum the affiant in this case *recklessly* included false statements, and the materiality of those false statements to the probable cause determination is readily apparent. Accordingly, we respectfully submit that Mr. Dancy is entitled to a Franks hearing to further challenge the veracity of the warrant affidavit and in turn the validity of the search warrant and the fruits thereof.

## VI.    Disclosure of CI Files

Pursuant to Rule 16 of the Federal Rules of Criminal Procedure, the Government should be directed to provide CW1's confidential source file with the DEA detailing the extent and involvement of his cooperation with federal authorities that began in or around 2017. This information may further be discoverable as Brady and/or Giglio material.

The defense requires access to CW1's confidential source file, because we have concerns regarding the timing of the alleged cooperation. We need to determine, by more than the Government's mere verbal representations, that CW1 was not authorized to engage in criminal activity, and/or if such activity was authorized in furtherance of the Government's investigation. This information is critical to the preparation of Mr. Dancy's defense and cannot be verified without direct access to his confidential source file.

Disclosure of this information also fits squarely with the Court's decision in <u>Roviaro v.</u> <u>United States</u>, 353 U.S. 53 (1957). In <u>Roviaro</u>, referring to the privilege of confidential informants to have their identity protected; the court stated:

> *"The scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable."* <u>Roviaro v. United States</u>, 353 U.S. 53, 60, 77 S. Ct. 623, 627, 1 L. Ed. 2d 639 (1957)

In this instance, the privilege concern is not an issue. The confidential source file we are seeking access to, is that of CW1 who is charged in this district and is currently a fugitive from justice, and whose identity is known to Mr. Dancy. CW1's status as a confidential informant has clearly been established and is known to all parties. Accordingly, we respectfully request that your Honor direct the Government to turn over CW1's confidential source file so that we may review it in preparation for our defense at trial.

If your Honor is not inclined to direct the Government to provide the defense access to CW1's confidential source file, we would request that your Honor review the source file in camera and make a determination as to which items therein should be provided to the defense. Alternatively, and at the very least, we would respectfully request that your Honor instruct the Government to perform a thorough inventory and review of the contents of CW1's confidential source files located in the District of New Jersey, Eastern District of New York, Southern District

of New York and elsewhere, and provide the defense with a detailed summary as to the results of Its inquiry.

## VII.    The Government Must Produce All Discoverable Material, Including *Brady,* From the ECPO Investigation

Darryl Dancy is entitled to all Rule 16, *Brady*, *Giglio* and Jencks Act material generated the Essex County Prosecutor's Office investigation into this matter, as the government is in "constructive possession" of these materials.  The Third Circuit has held that, under certain circumstances, evidence possessed by state agents may be "constructively possessed" by a federal prosecutor such that the prosecutor has a duty to obtain that evidence and disclose it to the defense. *United States v. Risha*, 445 F.3d 298, 303-06 (3d Cir.2006). Constructive possession has been defined by the Third Circuit to mean that "although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir.1993).  In *Risha*, the Third Circuit created a three-part test to determine if "cross jurisdictional constructive knowledge" is present.  Such knowledge is imputed if: (1) the party with knowledge of the information is acting on the government's "behalf" or is under its "control"; (2) state and federal governments are part of a "team," are participating in a "joint investigation" or are sharing resources; and (3) the entity charged with constructive possession has "ready access" to the evidence.  *Risha*, 445 F.3d at 304.

With respect to the first prong, the court must look to the "intermingling of state and federal forces."  *Risha*, 445 F.3d at 304; *see also United States v. Leos-Hermosillo*, No. 98-50546, 2000 WL 300967 at *3, 2000 U.S. App. LEXIS 5012 at *8 (9th Cir. Mar. 22, 2000) (holding that even though an officer "was not employed by . . . the federal government, he was no less an agent of the federal government; he was acting on its behalf and subject to its control").  In *United States*

*v. DePiro*, the court found that this prong was satisfied where the Waterfront Commission of New York Harbor was acting on behalf of the federal government and its agents, despite the fact that it was unclear whether the Commission was under federal control.  No. 10-CR-851 (DMC) (Feb. 20, 2013, D.N.J.).   The court further found that while the record was unclear on how much intermingling occurred, the Commission explicitly stated in its official report that they were involved in the investigative and prosecutorial planning of the matter. (Commission Report).

It is our understanding that ECPO shared all of its files with the federal government and communicated with them regarding the matter in advance of and after the federal government decided to adopt the matter for federal prosecution.  *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C.Cir.1992) (holding that the prosecution must search files of other branches of government if they are "closely aligned with the prosecution" or have a "close working relationship"); *DePiro*, No. 10-CR-851 (DMC) (Feb. 20, 2013, D.N.J.) (close relationship between the state and federal government where commission stated that it "led or significantly participated in investigations and prosecutions" that led to indictments); *United States v. Rigas,* 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011) (citing *Risha* test for constructive possession and finding that SEC jointly investigated Defendants with federal prosecutors).

Finally, with respect to the third prong of *Risha,* it is clear that the Essex County prosecution files are readily available to the government as some materials from those files, such as warrant affidavits, have already been produced.  To the extent additional Rule 16, *Brady*, *Giglio* and Jencks Act material are contained within those files, the government should be compelled to determine that and produce them to Darryl Dancy as they are within the government's constructive possession.

## VIII.   Preservation of Rough Notes / Reports / Contemporaneous Materials

Darryl Dancy moves this Court to compel all prosecution law enforcement agents who participated in the investigation of this matter to retain and preserve: (1) contemporaneous rough notes taken by a prosecution agent of meetings, conversations, briefings, or interviews during the course of their investigation; (2) subsequently prepared drafts of these incidents; and (3) the final report signed by the agent.  These documents must be kept regardless of whether the contents are incorporated in official records.  This motion is made in order that the Court may determine whether disclosure of the requested documents is required under *Brady* or the Jencks Act. *See United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977), *cert. denied*, 434 U.S. 1074 (1978) (court held that the rough interview notes of an F.B.I. agent should be kept and produced so that the trial court can determine whether the notes should be made available to the accused under *Brady* or the Jencks Act).

The prosecution has undoubtedly conducted extensive investigations of and interviews with numerous witnesses.  The Third Circuit has long held that the prosecution must retain and, upon motion, make available to the district court, both the rough notes and its agents' draft reports to facilitate a court's determination whether they should be produced.  *See United States v. Ramos*, 27 F.3d 65, 68-71 (3d Cir. 1993); *United States v. Ammar*, 714 F.2d at 276.  In any event, it has been said that the prosecution's failure to take appropriate steps to preserve evidence may, in some circumstances, constitute grounds for reversal. *See Prosecution of the Virgin Islands v. Testamark*, 570 F.2d 1162, 1165 (3d Cir. 1978).  Accordingly, all rough interview notes prepared by prosecution agents must be disclosed to the defense, including those prepared during the investigation by the ECPO.  *See* Point IV, *supra*.

IX.     **Grand Jury Transcripts**

Federal Rule of Criminal Procedure 6(e)(3)(E)(I) permits the Court to order the disclosure of grand jury proceedings "preliminarily to or in connection with a judicial Case. U.S.C.S. Fed. Rule Crim. Proc. R. 6(e)(3)(E)(I). Disclosure of grand jury transcripts is appropriate where the defendant shows a "particularized need" for the materials that outweighs the policy underlying grand jury secrecy. Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 223-24 (1979). A party seeking grand jury transcripts must show "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." Id. at 222. Where the Defendant shows a particularized need for grand jury transcripts that outweighs the need for secrecy, the trial judge may segregate extraneous materials and issue protective orders in unusual situations. Dennis v. United States, 384 U.S. 855, 875 (1966). "'Problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility . . .' are 'cases of particularized need where the secrecy of the proceedings is lifted discretely and limitedly.'" Dennis v. United States, 384 U.S. 855, 870 quoting Procter & Gamble Co., 356 U.S. 677, 681. In Dennis, the U.S. Supreme Court held that the Defendant demonstrated a "particularized need" and made a showing "substantially beyond the minimum required by Rule 6(e)" when the Defendant requested the transcript of the grand jury testimony of witnesses for possible impeachment at trial. Dennis v. United States, 384 U.S. 855, 874. The Court reasoned that in our adversary system it is "rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact." Id. at 873. The Court recognized that in a conspiracy case in which the witnesses testified to conversations that were largely uncorroborated, "the question of guilt or innocence may turn on exactly what was said

[and] the defense is clearly entitled to all relevant aid which is reasonably available to ascertain the precise substance of these statements." Id. at 872-873. To that end, the Court acknowledged that the grand jury testimony would likely be more accurate than testimony at trial, given that witnesses memories would be better closer in time to the charged events. Id. at 872. The Court stated, "[W]e cannot accept the view of the Court of Appeals that it is 'safe to assume' no inconsistencies would have come to light if the grand jury testimony had been examined. There is no justification for relying upon assumption." Id. at 874. Here, as in Dennis, Mr. Dancy has a particularized need to obtain grand jury transcripts of witness testimony for impeachment at trial. Because of the uncorroborated nature of witness testimony in this case, it is of particular importance that counsel test the veracity and accuracy of the testimony. Additionally, because of the time that has passed since the superseding indictment was filed the grand jury testimony closer in time to the charged events, and it is more likely that the witnesses' memories of the charged events were better at that time. Because it is critical that Mr. Dancy adequately cross examine the witnesses against him, he has a particularized need for the transcript of their testimony before the grand jury. Mr. Dancy's Particularized Need for the Transcript of the Grand Jury Proceedings in this Matter Outweighs the Diminished Need for Secrecy in a Completed Grand Jury Proceeding. Mr. Dancy's need for the grand jury transcripts outweighs the policy underlying grand jury secrecy. The policy reasons behind the secrecy of grand jury proceedings include 1) preventing the escape of those who might be indicted 2) to prevent interference with the deliberation of the grand jury 3) to prevent interference with witnesses who testify at the grand jury and who may later testify at trial 4) to encourage witnesses to disclose information and 5) to protect the innocent who are accused and exonerated by a grand jury. Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218 fn. 9.

While the Court must consider the effects of disclosure on future grand juries as well as the particular grand jury, the interests in grand jury secrecy are reduced when the grand jury completes its activities. Douglas Oil, 441 U.S. at 222. "[A]fter the grand jury's functions are ended disclosure is wholly proper where the ends of justice require it." United States v. Socony Vacuum Oil Co., 310 U.S. 150, 234 (1940). The circumstances here favor disclosure because the policy reasons supporting nondisclosure are largely moot. The grand jury has completed its deliberations, therefor the interests in grand jury secrecy are significantly reduced. The risk is eliminated that disclosure would interfere with those deliberations or discourage witnesses from providing testimony before the grand jury. Mr. Dancy has been publicly indicted and incarcerated pending trial, therefore there is no danger of flight should the transcript be released.

Because Mr. Dancy has a significant interest in obtaining the grand jury transcript in order to prepare and present his defense, and this interest outweighs the minimal need for secrecy in a completed proceeding, Mr. Dancy respectfully requests disclosure of the grand jury transcript in this matter.

## X.   Early Disclosure of Jencks Act Material of Prosecution Witnesses Under 18 U.S.C. 3500

The Jencks Act requires a court, upon motion of the defendant and after direct examination of a prosecution witness, to order the prosecution to produce to the defense "any [pretrial] statement...of the witness in [its] possession...which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).  The Court, pursuant to its inherent supervisory power to control discovery, may order the prosecution to provide Officer Wheaten with witnesses' statements and in order to expedite the trial and avoid unnecessary delays, should request the prosecution to turn over its Jencks Act materials in advance of trial. See, e.g., United States v.

_Bissell_, 954 F. Supp. 841 (D.N.J. 1996) ("Although disclosure of Jencks material prior to the conclusion of direct examination of the Prosecution's witness cannot be compelled, early disclosure to obviate trail interruptions is encouraged."); _United States v. Hill_, 976 F.2d 132, 140 (3d Cir. 1992) (court encouraged early disclosure of Jenks material to avoid undue delay at trial).

Disclosure of Jencks material to the defense after the testimony of each witness will preclude pretrial resolution of admissibility issues, and perhaps hinder or truncate the Mr. Dancy's investigation concerning that material. It is respectfully submitted that the Court should exercise its discretion and invoke its inherent supervisory power to require the prosecution to make early pretrial disclosure of all Jencks material. Such an order would fully protect Mr. Dancy's right to a fair trial and to the assistance of counsel, and would permit the defense to begin cross-examination immediately after each witness testifies. Also, any disputed materials that need to be forwarded to the Court for an _in camera_ review can be decided without delaying the trial. Early pretrial disclosure of Jencks material will satisfy not only defendant's interest in a fair trial, but also the mutual interest of the Court and the public in expediting trial and avoiding delays.

## XI.    Early Disclosure of 404(B) Material

Darryl Dancy moves for an order compelling the Government to provide pre-trial disclosure of any Rule 404(b) evidence it intends to introduce at trial. Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan knowledge, identity, or absence of mistake or accident. On request by a defendant, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at

trial; and do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(2)(A)-(B).

The purpose of the pre-trial notice requirement of Rule 404(b) is "'to reduce surprise and promote early resolution on the issue of admissibility.'" *United States v. Giampa,* 904 F.Supp. 235, 283 (D.N.J. 1995) (quoting *United States v. Williams,* 792 F.Supp. 1120, 1133 (S.D.Ind.1992) and Rule 404(b), Notes of Committee on the Judiciary, Senate Report No. 93-1277 U.S. Code Cong. & Admin. News 1974, p. 7051)). The determination of "what constitutes a reasonable request or disclosure will depend largely on the circumstances." *Williams,* 792 F.Supp. at 1133 (creating general ten-day rule) (quoting Rule 404(b), Notes of Committee on the Judiciary, Senate Report No. 93-1277); *cf. United States v. Kern,* 12 F.3d 122, 124 (8th Cir.1993) (notice fourteen days prior to trial is sufficient under Rule 404(b)); *Giampa,* 904 F.Supp. at 283 (ordering notice two weeks before trial); *United States v. Evangelista,* 813 F.Supp. 294, 302 (D.N.J.1993) (notice ten business days prior to trial is sufficient under Rule 404(b)); *United States v. Alex,* 791 F.Supp. 723, 729 (N.D.Ill.1992) (ordering notice seven days before trial).

Darryl Dancy respectfully requests that the Court compel the government to disclose all 404(b) evidence sufficiently in advance of trial to permit investigation into the alleged conduct, as well as thorough motion practice.

## XII.    Permission to File Additional Motions and/or Supplement Motions as the Need Arises in Advance of Trial

After the return date of this Motion, additional Motions may be necessary based on additional production of materials and or further defense investigation. Accordingly, we respectfully request permission to file additional motions and/or supplement the instant motions as the need arises in advance of trial.

## CONCLUSION

For the reasons set forth above, Defendant Darry Dancy respectfully requests that the Court enter an Order granting the: 1) Dismissal of the Superseding Indictment and/or certain counts of the Superseding Indictment; 2) a <u>Franks</u> hearing; 3) disclosure of the CI's confidential source / confidential informant file and/or permitting in camera review of same; 4) production of all discoverable materials in the files of the Essex and Union County Prosecutor's Offices; 5) preservation and disclosure of agents' rough notes and contemporaneous materials; 6) disclosure of grand jury transcripts for both the initial and superseding indictments; 7) early production of Jencks Act materials; 8) early disclosure of 404(b) materials; 9) exclusion/suppression of any pretrial statements by Mr. Dancy; 10) permission to file additional motions and/or supplement motions as the need arises in advance of trial; 11) a hearing on these issues.

BIANCAMANO LAW, LLC
Attorneys for Defendant Darryl Dancy

Dated: November 8, 2022                    By:    s/ Daniel Holzapfel, Esq.____
                                                  Daniel Holzapfel, Esq.